UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BLACK LOVE RESISTS IN THE RUST, DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL, JANE DOE, Individually and on behalf of a class of Others similarly situated, SHIRLEY SARMIENTO, EBONY YELDON, CHARLES PALMER, SHAKETA REDDEN, and JOSEPH BONDS, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. 1:18-cv-00719 |
| CITY OF BUFFALO, N.Y., BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities, BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual capacity, DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity, AARON YOUNG, officer of the Buffalo Police Department, in his individual capacity, KEVIN BRINKWORTH, PHILIP SERAFINI, officer of the Buffalo Police Department, in his individual capacity, ROBBIN THOMAS, officer of the Buffalo Police Department, in his individual capacity, UNKNOWN SUPERVISORY PERSONNEL 1-10, officers of the Buffalo Police Department, in their individual capacities, UNKNOWN OFFICERS 1-20, officers of the Buffalo Police Department, in their individual capacities, and ERIE COUNTY DISTRICT ATTORNEY'S OFFICE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CLASS
### (Doc. 202)

Plaintiffs Shaketa Redden, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Joseph Bonds, Charles Palmer, Shirley Sarmiento, Ebony Yeldon, and Jasmine Evans bring this action against the City of Buffalo, New York (the "City"); City of Buffalo Mayor Byron B. Brown; Buffalo Police Department ("BPD") Commissioner Byron C. Lockwood; former BPD Commissioner Daniel Derenda; Aaron Young; Kevin Brinkworth; Philip Serafini; Robbin Thomas; and 1-10 unknown supervisory officers and 1-20 unknown officers (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers, in accordance with an implicit quota system, continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs seek to certify three distinct classes: (1) a "Checkpoint Class";[1] (2) a "Tinted Windows Class";[2] and (3) a "Traffic Enforcement Class."[3] (Doc. 211 at 3.)

The Checkpoint Class, represented by Plaintiffs Bonds, Evans, and Redden, asserts claims for: (1) a violation of the Fourth Amendment; (2) a violation of the Fourteenth Amendment Due Process Clause; (3) a violation of the Fourteenth

---

[1] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[2] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.*

[3] Plaintiffs define the Traffic Enforcement Class as: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." *Id.*

Amendment Equal Protection Clause; and (4) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

The Tinted Windows and Traffic Enforcement Classes assert claims for: (1) a violation of the Fourteenth Amendment Equal Protection Clause; (2) a violation of the Fourteenth Amendment Due Process Clause; and (3) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d). Plaintiffs Franklin, Palmer, and Yeldon are the proposed class representatives for the Tinted Windows Class. All individual Plaintiffs in the suit will serve as class representatives for the Traffic Enforcement Class.

Plaintiffs seek a declaration that Defendants have violated Plaintiffs' constitutional rights and a class-wide injunction mandating significant changes in Defendants' policies, practices, and customs, as well as an award of compensatory and punitive damages, attorney's fees, and costs.

Plaintiffs seek class certification under Fed. R. Civ. P. 23(a) and 23(b)(3) for the Checkpoint and Tinted Windows Classes, and class certification under Fed. R. Civ. P. 23(a) and 23(b)(2) for the Traffic Enforcement Class. In their supplemental submission in support of class certification, they advised that "the Checkpoint and Tinted Windows Classes will not seek to recover damages for consequential harms, such as emotional distress and lost wages[.]" (Doc. 241 at 1) (emphasis in original). For these classes, Plaintiffs intend to pursue "(1) general damages in an amount determined by the jury;[] (2) punitive damages in an amount determined by the jury; (3) direct economic damages, consisting of the fines and fees that class members paid in connection with tickets and impounds; and (4) equitable disgorgement of the same." *Id.* at 2.

Plaintiffs are represented by Claudia Wilner, Esq., Andrea Chinyere Ezie, Esq., Andrew J. Timmick, Esq., Anjana Malhotra, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Edward Krugman, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., Jordan Scott Joachim, Esq. Defendants are represented by Peter A. Sahasrabudhe, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

## I.      Plaintiffs' Factual Allegations.

The following facts are derived from Plaintiffs' Amended Complaint and the parties' briefing.

### A.      The Strike Force Checkpoints.

In 2012, Mayor Brown and former Police Commissioner Derenda created "a mobile unit that targeted supposed crime hotspots to reduce guns, drugs, and gang activity[]" (the "Strike Force"). (Doc. 63 at 10, ¶ 35.) The Strike Force operated through the Checkpoints and required any vehicle approaching to be stopped, regardless of whether BPD Officers had "probable cause or reasonable, articulable suspicion that the driver ha[d] violated any criminal or traffic laws." *Id.* at 11, 15, ¶¶ 36, 61. Plaintiffs assert that the Checkpoints were often established on one-way streets and were not marked in any way to alert approaching motorists. BPD officers or their supervisors determined the Checkpoint locations.

Based upon statistical analyses, Plaintiffs allege that a neighborhood's racial composition was a significant factor in determining Checkpoint locations because a majority of the Checkpoints were established in overwhelmingly Black or Latino neighborhoods. BPD Checkpoint data, through June 30, 2017, allegedly reveals that "BPD conducted nearly 40% of all Checkpoints . . . in just three of Buffalo's 77 Census tracts. In each of those three tracts, the Black or Latino population exceeded 86%." *Id.* at 18, ¶ 83. BPD also considered the number of reported crimes in a particular area in determining Checkpoint locations. Plaintiffs contend, however, that crime statistics played only a minor role in designating a Checkpoint, and that the Checkpoint locations were unrelated to traffic safety concerns.

BPD Officers conducted Checkpoints in stages. During the first stage, vehicles passing through the Checkpoint were subject to automatic license plate readings, with BPD Officers checking for "valid licenses, registration, inspection stickers, seatbelts, and anything suspicious in plain view." *Id.* at 11, ¶ 41. At this stage, BPD Officers asked motorists questions such as "Where are you going?" and "Where are you coming from?" *Id.* at ¶ 42 (internal quotation marks omitted). Depending on the outcome of the first

4

stage, BPD Officers directed some motorists to pull over for a second stage, during which motorists were subjected to longer detentions and questioning.

Plaintiffs contend that Strike Force and Housing Unit Officers "conducted the Checkpoints in a uniform manner in accordance with" BPD's policy, (Doc. 211 at 14), which failed to constrain officer discretion, because it was allegedly devoid of "written rules, standards, or guidelines" regarding when officers should direct motorists to secondary stops. (Doc. 63 at 12, ¶ 45.) Plaintiffs assert BPD leadership "do[es] not gather and review statistical information" regarding Checkpoints that would reveal whether they are conducted pursuant to racially discriminatory practices. *Id.* at 38, ¶ 201.

BPD Officers conducting Checkpoints were instructed to complete a Checkpoint Directive, although they did not always comply with this requirement, and some Checkpoints were undocumented as evidenced by ticketing data that reveals citations on dates with no Checkpoint Directives. Plaintiffs contend that these undocumented Checkpoints were operated "as a common practice over a period of years . . . and with the knowledge and approval of senior officers." *Id.* at 14, ¶ 59.

The Strike Force partnered with the BPD Housing Unit to implement Checkpoints near housing complexes operated by the Buffalo Municipal Housing Authority ("BMHA"). These joint Checkpoints were allegedly conducted "to suppress blatant drug/weapons activity and to show a high level of enforcement and visibility." *Id.* at 17, ¶ 74 (internal quotation marks omitted). Plaintiffs allege the Housing Unit focused on patrolling three BMHA properties, all of which have a significant majority of either Black or Latino residents. When concerns arose that Checkpoints were being conducted in a racially discriminatory manner in 2015, BPD "began to conduct Checkpoints in white neighborhoods that had never previously experienced Checkpoints . . . in an effort to demonstrate to the public that it did not conduct Checkpoints in a discriminatory manner." *Id.* at 36, ¶ 184.

The Strike Force and BPD Housing Unit conducted Checkpoints through January 2018. The Strike Force was dissolved in February 2018, and Strike Force officers were transferred to the Division of Traffic Enforcement. Plaintiffs allege that, although

Checkpoints are no longer conducted, there is "no formal policy ending the Checkpoint program" and BPD leadership "could direct BPD Officers to resume operating Checkpoints at any time." *Id.* at 38, ¶ 199.

### B.    The BPD's Ticketing Practices.

In certain circumstances, BPD Officers have the discretion to issue multiple traffic citations for a tinted windows violation on a single vehicle. Plaintiffs contend that "non-White motorists are much more likely to be ticketed by the BPD than are White motorists[,]" (Doc. 63 at 24, ¶ 110), and that a motorist's race is a strong predictor of whether BPD Officers exercise their discretion to issue a single tinted-window citation, or multiple tinted-window citations during a stop. Plaintiffs argue BPD leadership "do[es] not gather and review statistical information about traffic stops outside Checkpoints[]" to determine racially discriminatory traffic law enforcement. *Id.* at 38, ¶ 202.

Plaintiffs allege that BPD's aggressive enforcement of traffic laws is a product of the City's "custom, policy, or practice of generating revenue through traffic enforcement[.]" *Id.* at 25, ¶ 120. Although historically New York State received traffic enforcement proceeds, in 2014, the Buffalo Common Council and New York State legislature established the Buffalo Traffic Violations Agency ("BTVA"), an agency responsible for adjudicating non-misdemeanor traffic violations. Creation of the BTVA allowed the City to retain the revenues generated from traffic law enforcement.

Plaintiffs allege there was a marked increase in the number of citations issued after the BTVA was created. As a result of increased revenues, the City appropriated more money for the BPD, and in turn, the BPD increased spending on overtime for Strike Force officers which substantially increased their pay. The City allegedly has continued this practice, notwithstanding the cessation of Checkpoints and the dissolution of the Strike Force.

## II.    Legal Conclusions and Analysis.

### A.    Whether Plaintiffs' Requested Injunctive Relief Would Merely Require Defendants to Obey the Law.

In their Amended Complaint, on behalf of the Traffic Enforcement Class, Plaintiffs seek to preliminarily and permanently enjoin Defendants:

(a)    From continuing the policy, practice, and custom of conducting vehicle Checkpoints for the purpose of general crime control;

(b)    From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

(c)    From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

(d)    From continuing to enforce and assess any of the 13 BTVA fees enumerated in § 175-1 of Buffalo Municipal Code Chapter 175[;]

(e)    To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:

   i.    conducting vehicle Checkpoints for the purpose of general crime control;

   ii.    enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflects an improper pecuniary motive[;]

(f)    To institute and implement appropriate and adequate supervision and discipline of BPD officers and personnel who conduct vehicle Checkpoints;

(g)    To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act; [and]

(h)     To implement appropriate measures to ensure that
        documentation of all traffic stops and vehicle Checkpoints is
        retained in a single, up-to-date computerized database[.]

*Id.* at 73-74.

Defendants challenge Plaintiffs' proposed injunctive relief as requesting an "obey the law" injunction. Plaintiffs counter that they seek injunctive relief in the form of "a single, class-wide order directing the City to modify its policies and procedures to prevent the BPD from engaging in racially motivated traffic stops and ticketing and retaining jurisdiction until such time as the City can establish compliance[.]" (Doc. 241 at 4.)

"Under Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law." *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22 (2d Cir. 2023) (alteration and internal quotation marks omitted) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001)). It must instead "'state its terms specifically' and 'describe in reasonable detail . . . the act or acts restrained or required[.]'" *Poor v. Amazon.com Servs. LLC*, 104 F.4th 433, 441 n.8 (2d Cir. 2024) (quoting Fed. R. Civ. P. 65(d)).

Although Plaintiffs provide examples of remedies that they may request,[4] and which may narrow and further define the scope of the requested injunctive relief, their Amended Complaint cannot be amended by their briefing. *See Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F. App'x 17, 20 (2d Cir. 2020) ("[A] complaint may not be amended by . . . an opposition brief wholly unsupported by factual allegations in the complaint.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 541 (S.D.N.Y. 2021) ("[A] plaintiff may not raise new facts in opposing dismissal and ask the [c]ourt to rely

---

[4] Plaintiffs' examples of appropriate relief include: "[c]essation of BPD policies and practices contributing to racially biased traffic enforcement[]"; "[r]eforms to supervision and officer performance evaluation criteria"; "[r]eforms to the Internal Affairs Department"; and "[a] mechanism overseen by a court-appointed monitor[.]" (Doc. 241 at 11.)

on those facts in determining whether he or she has stated a claim.") (quoting *Wright*, 152
F.3d at 178).

To the extent Plaintiffs' injunctive relief requests "obey the law" relief, it is not
available under Rule 65(d). *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d
114, 144 (2d Cir. 2011) (alteration adopted) (finding that injunctions that "impose[d] on
defendants an obligation to act 'in full conformity with applicable laws pertaining to
firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those
laws[]" failed under Rule 65(d)); *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D. Vt.
June 24, 2021) (noting plaintiff's claims for injunctive relief failed "because her request
for a command to 'direct defendants from violating the law' did not comply with Federal
Rule of Civil Procedure 65(d) and Second Circuit precedent requiring that an injunction
be more specific than a simple command that the defendant obey the law[]") (citation
omitted)).

**B.      Whether the Traffic Enforcement Class has Standing.**

Plaintiffs seek injunctive relief for the Traffic Enforcement Class consisting of
"[a]ll Black and/or Latino individuals who have been or will be subjected to traffic stops,
traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." (Doc. 211 at 12.) The
Traffic Enforcement Class is virtually limitless because it does not specify a time period
for class membership or specify a future duration for the proposed injunction. Plaintiffs
concede that BPD leadership "do[es] not gather and review statistical information"
regarding traffic stops outside Checkpoints. (Doc. 63 at 38, ¶ 201.)

Although Plaintiffs are correct that the inclusion of future members does not
defeat class certification,[5] for purposes of standing, Plaintiffs' proposed relief requires the
court to forecast the likelihood of future constitutional violations.

---

[5] *See, e.g.*, *Barrows v. Becerra*, 24 F.4th 116, 130 n.54 (2d Cir. 2022) ("The final class certified
by the district court includes[ a]ll Medicare beneficiaries who, on or after January 1, 2009 . . . .");
*Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 79 (2d Cir. 2015) (affirming district court's
certification of a class that comprised "all persons who have been or will be sued by the Mel
Harris defendants as counsel for the Leucadia defendants"); *Marisol A. v. Giuliani*, 126 F.3d
372, 378 (2d Cir. 1997) (involving certified class comprised of "children who are or will be in

Defendants argue that, because the City ceased using Checkpoints as of January 2018 and disbanded the Strike Force, the Traffic Enforcement Class lacks standing to pursue injunctive relief as any future injury is purely speculative. Plaintiffs respond that Defendants have not disavowed the Checkpoints, which could resume at any time, and that the potential for their revival poses a non-speculative threat of constitutional violations.

In a class action, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117-18 (2d Cir. 2022) (citing *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)); *see also Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing[.]"). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61).

When seeking injunctive relief, "[a plaintiff] must carry the burden of establishing that 'he [or she] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). In meeting his or her burden, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he [or she] . . . will be injured in the future." *Id.* (internal quotation marks omitted) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). A showing of an "abstract injury is not enough; rather, '[t]he injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

---

the custody of the New York City Administration for Children's Services") (internal quotation marks omitted).

At the pleading stage, the burden to establish standing is minimal. As a case progresses, and certainly at class certification, the evidence necessary to satisfy standing increases. *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("[T]he showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds."). The Supreme Court has explained:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lujan*, 504 U.S. at 561 (alteration adopted) (internal citations and quotation marks omitted).

Although Plaintiffs assert there is "no formal policy ending the Checkpoint program[,]" (Doc. 63 at 38, ¶ 199), they cite no evidence that BPD has taken steps to resume them. Several individual Plaintiffs in the Traffic Enforcement Class attest to having received multiple traffic citations unrelated to Checkpoints. Plaintiff Bonds declared "[i]n 2019, I received so many tickets while my car was not in use and parked at my BMHA residence that I eventually had to sell my car because I could not afford to pay for the tickets or to keep my car in a private garage to avoid getting more tickets." (Doc. 202-1 at 2-3, ¶ 12.) Plaintiff Yeldon declared that:

> In December 2017[,] I was driving my taxi in a predominantly white neighborhood on the South Side of Buffalo, when BPD Officer Michael Healy pulled me over and issued me two tickets for tinted windows and one ticket for driving without insurance (even though the car belonged to my employer, and I had insurance at the time). In the summer of 2022 BPD ticketed my car while it was parked in the BMHA-owned parking lot of the Ferry Grider Apartments .... When I went to court, the ticket was dismissed.

(Doc. 202-9 at 1-2, ¶¶ 6-7.) All of these incidents refer to past harm.

In *Floyd v. City of New York*, 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012), the court found a plaintiff seeking an injunction mandating changes to New York City's stop and frisk program had standing because (1) the plaintiff had been stopped and frisked four separate times; (2) the plaintiff's "future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law"; and (3) "the frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury[.]"[6] The challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit.

Unlike in *Floyd*, the Checkpoints at issue in this case ceased in 2018, the Strike Force disbanded, and none of the Plaintiffs' attestations pertain to Checkpoints that took place in the past two years. Instead, Plaintiffs rely on the speculative possibility that, at some uncertain date in the future, the Checkpoints may resume. This will not suffice for standing for injunctive relief.

To the extent Plaintiffs rely on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, and to receive multiple tickets if cited, *see* Doc. 63 at 24, ¶ 110, this evidence also reflects past alleged harms. Although Plaintiffs contend the "frequency of alleged injuries . . . creates a likelihood of future injury[,]" *Floyd*, 283 F.R.D. at 170, it does not rise to a "real and immediate[] threat of future injury[.]" *Shain*, 356 F.3d at 215; *see also Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a

---

[6] The district court had previously "declar[ed] the Street Crime Unit's ('SCU') practice and/or custom of suspicionless stops and frisks to be unconstitutional." *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 158 (S.D.N.Y. 1999). The court found the individual plaintiffs had established standing because: (1) "there is [a] difference in the number of alleged constitutional violations resulting from the challenged policies"; (2) the victims "claim they have been victimized by [the] unconstitutional practices repeatedly"; and (3) "there is no chain of contingencies making the threat of future harm speculative. . . . [P]laintiffs do not have to break the law to be exposed to the alleged constitutional violations." *Id.* at 161.

federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").[7]

Because no Plaintiff has established that he or she is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" *Shain*, 356 F.3d at 215 (internal quotation marks omitted) (quoting *Lyons*, 461 U.S. at 101-02), Plaintiffs have failed to establish that the members of the Traffic Enforcement Class have standing. For this reason, the Traffic Enforcement Class's request for class certification DENIED. *See MacNamara v. City of New York*, 275 F.R.D. 125, 132, 140 (S.D.N.Y. 2011) (finding individuals arrested by the NYPD for their protests during the 2004 Republican National Convention did not have standing because they failed to establish the likelihood of a future encounter with the police that would result in unconstitutional arrests and detentions).

C.      **Whether the Remaining Proposed Classes Satisfy Fed. R. Civ. P. 23.**

Plaintiffs seek damages on behalf of the Checkpoint Class and the Tinted Windows Class and request class certification to establish the alleged constitutional violations that give rise to their damages claims. "Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011) ("*Wal-Mart*"). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).

Under Rule 23(a), the party seeking certification must establish:

(1)      the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

---

[7] Part of the standing inquiry is to ensure that the party seeking injunctive relief faces a threatened injury separate and distinct from the public at large. *Israel v. United Nations*, 2025 WL 641566, at *2 (S.D.N.Y. Feb. 26, 2025) ("A litigant raising only a generally available grievance . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy.") (internal quotation marks omitted) (ellipses in original) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013)).

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

*Wal-Mart*, 564 U.S. at 345 (internal quotation marks omitted). These requirements are referred to as "numerosity, commonality, typicality, and adequacy." *Davis v. City of New York*, 296 F.R.D. 158, 163 (S.D.N.Y. 2013).

In determining whether class certification is appropriate, "[i]t is proper for a district court to accept the complaint allegations as true[,]" *Johnson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2020 WL 2558160, at *1 (W.D.N.Y. May 19, 2020) (alteration adopted) (internal quotation marks omitted) (quoting *Waggoner v. Barclays PLC*, 875 F.3d 79, 85 n.5 (2d Cir. 2017)), and it may "consider material outside the pleadings . . . , including affidavits." *Id.* (internal quotation marks omitted) (quoting *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005)).

While a district court must make factual determinations to ascertain whether the requirements of Fed. R. Civ. P. 23 have been met, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement[.]" *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

### 1.     Whether the Remaining Proposed Classes Meet the Numerosity Requirement.

A proposed class must be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible[,]" *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993), it means joinder would be "expensive, time-consuming, and logistically unfeasible." *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992). In making this determination, "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux*, 987 F.2d at 935. Instead, district courts consider factors beyond "mere numbers . . . includ[ing] judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial

14

resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.* at 936 (citation omitted).

Plaintiffs allege that the Checkpoint Class contains "at least 3,000 members[,]" and the Tinted Windows Class contains more than 6,000 members. (Doc. 211 at 33.) The total number of individuals in this case is thus estimated to be close to ten thousand. Defendants do not contest numerosity, and the court finds this requirement has been met.[8]

### 2. Whether the Remaining Proposed Classes Meet the Commonality Requirement.

Fed. R. Civ. P. 23(a)(2) requires that there be common questions of law or fact to the class. "[C]laims for relief need not be identical for them to be common." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (internal quotation marks omitted). Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]'" *Wal-Mart*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. "What matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (internal quotation marks omitted).

"Plaintiffs seeking class certification based on challenges to a defendant's policies must show that the policies caused every class member's injury." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1263 (9th Cir. 2024) (citing *Wal-Mart*, 564 U.S. at 353, 355); *see V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 573, 575 (N.D.N.Y. 2017) (finding commonality was met where plaintiffs alleged the defendants

---

[8] *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("A group [of hundreds of defendants] would make the joinder of individual members as named defendants impracticable. Because numerosity is presumed at a level of 40 members, whether viewed as 700 tax-collecting jurisdictions or 300 assessing jurisdictions, the number of defendants vastly exceeds this threshold.") (citation omitted); *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992) (finding numerosity satisfied for a class of "nearly 850 claimants").

"ha[d] applied a common course of unlawful conduct to the members of the class"). To determine whether a proposed class meets the commonality requirement, "sometimes it may be necessary for the court to probe behind the pleadings[,]" *Falcon*, 457 U.S. at 160, which entails "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

Defendants argue that none of the proposed classes satisfy the commonality requirement because the determination of general and individualized damages, even with Plaintiffs' narrowing of the relief sought, is ill-suited for class action litigation. Commonality, however, may be satisfied by common questions of law and fact and need not encompass every issue in the case. *See id.* at 359.

Here, commonality for the Checkpoint Class arises out of allegedly uniform and unconstitutional BPD practices conducted at discrete and identifiable Checkpoints raising a legal challenge common to all class members and all Defendants.[9] *See Floyd*, 283 F.R.D. at 173-74 (finding claims based on NYPD's stop-and-frisk policy met the commonality requirement because they "generate[d] from a centralized source and NYPD employs a hierarchical supervisory structure to effect and reinforce its department-wide policies[]"); *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (finding commonality where plaintiffs allege "a specific policy promulgated by [d]efendants, namely, that [d]efendants have established a practice by which NYPD officers issue summonses without probable cause in order to meet a summons quota[]"). Common questions of law include whether the initial stop was lawful and, if so, whether the secondary stop was lawful as well. *See Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011, at *14 (E.D.N.Y. Mar. 12, 2021) ("*Cnty. of Suffolk*")

---

[9] This type of commonality is particularly well-suited to class certification. *See, e.g., Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) ("[C]ommonality in cases alleging racial profiling is satisfied when 'the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members.'") (citing *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001)).

("The putative class members' and named representatives' claims need not arise out of 'the same course of events' based on identical circumstances leading up to the stop, but rather the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing.").

Common questions of fact include where and how the Checkpoints were located, who authorized them, the motive for establishing Checkpoints and whether it was the product of racial profiling, whether the officers' discretion was circumscribed and, if so, whether it was namely tailored to achieve a legitimate law enforcement objective, how the officers chose motorists for secondary inspections, how long detentions lasted at each stop and whether they were unreasonably prolonged, and how officers determined whether a motorist would be ticketed. Because Plaintiffs may seek nominal damages for the alleged constitutional violations, there is commonality for that type of relief as well. *See Luxenberg v. Vt. Dep't of Disabilities, Aging & Indep. Living*, 2024 WL 4894383, at *3 (D. Vt. Nov. 26, 2024) (stating "nominal damages are available when a constitutional violation is established[]") (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021); *Farrar v. Hobby*, 506 U.S. 103, 113 (1992) ("A plaintiff may demand payment for nominal damages no less than he [or she] may demand payment for millions of dollars in compensatory damages.")).

Defendants are correct that individualized claims for economic damages based on the factual basis for each ticket issued require individualized inquiries and Plaintiffs have yet to "offer 'some glue holding the alleged reasons for all those decisions together.'" *Black Lives Matter L.A.*, 113 F.4th at 1263 (citing *Wal-Mart*, 564 U.S. at 352). The possibility of individualized damages, however, does not defeat commonality because the constitutional injury to all class members is the same insofar as it involves an unconstitutional detention. Individual fines and fees are the collateral consequences of that injury. Defendants' challenge regarding individualized damages is thus more properly considered in the context of predominance.

With regard to the Tinted Windows Class, Plaintiffs allege BPD discriminated against Black and Latino motorists and ticketed them to raise revenues which, in turn,

17

were paid in overtime to BPD Officers. Plaintiffs' statistical evidence allegedly reveals common trends documenting this practice despite a change in BPD leadership.[10] They allege that BPD leadership has been made aware of the issue, and has been unwilling or unable to remedy it. In addition, Plaintiffs allege that discriminatory practices emanated from uniform policies at the highest level of the City and the BPD. *See Cnty. of Suffolk*, 2021 WL 1255011, at *14 (finding commonality where plaintiffs "show[ed] that the types of policies, practices, and decisions at issue were made at high levels of the department[]"). These are common questions of fact which will benefit from class treatment.

Defendants nonetheless raise a legitimate concern regarding individualized damages inquiries. Plaintiffs have yet to propose a common methodology for awarding damages based on tinted windows violations. They, however, do not challenge the initial lawfulness of the tinted-window stops, only the racially motivated ticketing practices that resulted therefrom. In this respect, there remain common issues of law and fact such as whether Black and Latino motorists received a statistically greater number of tinted-window tickets than white motorists, whether a policy circumscribed officer discretion, and whether BPD was aware of racial discrepancies and nonetheless allowed them to persist. The court therefore addresses the issue of individualized damages inquiries in the context of predominance rather than commonality.

Because there are common questions of law and fact for both the Checkpoint Class and the Tinted Windows Class, Plaintiffs have established commonality.

### 3.  Whether the Remaining Proposed Classes Meet the Typicality Requirement.

Rule 23 requires that class representatives' claims or defenses must be "typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "This requirement 'is

---

[10] *See Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011) (finding plaintiffs established commonality through statistical evidence that "there was a specific, city-wide policy in Tenaha of targeting racial and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting illegal searches and seizures of their property[]").

satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 (citation omitted).

Plaintiffs claim a violation of the Fourth Amendment under *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000), which holds that "[w]hen law enforcement authorities pursue primarily general crime control purposes at [vehicle] checkpoints . . . , stops can only be justified by some quantum of individualized suspicion." Plaintiffs Bonds, Evans, and Redden are the putative class representatives for the Checkpoint Class and "are Black individuals who were stopped pursuant to the Checkpoint Policy, and all received tickets at those Checkpoints." (Doc. 211 at 39.)[11] All claims "arise[] from the same course of events[.]" *Brown*, 609 F.3d at 475; *see also Floyd*, 283 F.R.D. at 175 (finding "NYPD's centralized program of stops and frisks" constitutes "the same course of conduct"). Although the dates, times, and locations of the stops may be different, "minor variations in the fact patterns underlying individual claims" do not defeat typicality.[12] *Yeend v.*

---

[11] The lack of Latino Class representatives does not preclude a finding of typicality. *See, e.g., Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2016) (finding typicality despite defendants' argument that "because none of the named representatives are Latino, they cannot represent the alleged Latino class members who make race-based claims[]") (internal quotation marks omitted).

[12] *See, e.g., Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (finding that where "plaintiffs and the putative class members were allegedly subjected to the same unlawful conduct by NYPD officers under the auspices of a single NYPD program: unjustified *Terry* stops, not supported by reasonable suspicion . . . the experiences of the named plaintiffs are identical to those of the proposed class, [and] the typicality requirement is . . . met"); *Daniels*, 198 F.R.D. at 418 (finding claims arising from suspicionless stop and frisks satisfied the typicality requirement because they challenged "the same unlawful conduct" and because "the named plaintiffs and the class members will allege that these stops were made in violation of the Fourth Amendment because the officers lacked reasonable suspicion to make a stop").

*Akima Glob. Servs., LLC*, 2025 WL 959968, at *12 (N.D.N.Y. Mar. 31, 2025) (quoting *Robidoux*, 987 F.2d at 936-37). Plaintiffs have therefore established typicality for the Checkpoint Class.

Plaintiffs Franklin, Palmer, and Yeldon seek to serve as the class representatives for the Tinted Windows Class and are "Black individuals who received multiple tinted-window tickets from BPD officers at a single traffic stop while driving in the City of Buffalo." (Doc. 211 at 39.) Their claims arise from BPD's allegedly unconstitutional practice of issuing multiple citations to Black and Latino motorists for tinted windows as a source of traffic enforcement revenue. This suffices to satisfy typicality because "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant[s'] liability." *Brown*, 609 F.3d at 475. *See also Cnty. of Suffolk*, 2021 WL 1255011, at *14 (finding that different circumstances prompting a traffic stop do not defeat typicality because plaintiffs all claim that "the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing[]").

Defendants argue that the Checkpoint Class and Tinted Windows Class lack typicality because some, but not all, Plaintiffs' individualized damages claims are barred by *Townes v. City of New York*. In *Townes*, the Second Circuit refused to adopt a "fruit of the poisonous tree" doctrine in § 1983 cases. 176 F.3d 138, 145 (2d Cir. 1999). This means a plaintiff seeking damages in a § 1983 action cannot argue that, because a detention or seizure was unconstitutional, all traffic enforcement that flowed from it was impermissible and is compensable by damages as the fruit of the unlawful activity. Defendants further contend that "[n]o matter how characterized, Plaintiffs' request for . . . damages . . . require individual determinations." (Doc. 245 at 8.) In so far as individualized damages are concerned, the court agrees. The court, however, treats this issue as a challenge to predominance. It remains true that the class representatives' claims are "typical of claims . . . of the class." Fed. R. Civ. P. 23(a)(3).

20

4.      **Whether the Remaining Proposed Classes Meet the Adequacy Requirement.**

Rule 23(a)'s adequacy requirement instructs that class representatives must fairly and adequately protect the interests of the class. "Two factors generally inform [whether class representatives satisfy the Rule 23(a)(4) requirement]: '(1) absence of conflict and (2) assurance of vigorous prosecution.'" *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (internal quotation marks and alteration omitted) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart*, 564 U.S. 338 (2011)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."). This inquiry focuses on "uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("*Flag Telecom*") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

Defendants argue that Plaintiffs fail to establish adequacy because "there is a divergence between class representatives who are barred from damages and class representatives and members who may be entitled to damages," purportedly rendering "the class representatives . . . inadequate." (Doc. 220 at 36.) Plaintiffs, however, have amended their requests and no longer seek individualized damages for emotional distress and lost wages. *See* Doc. 241 at 1. For their remaining individual damages claims, adequacy exists because there is no evidence the class representatives' claims conflict with those of other classes or within the class. The fact that one class member may receive greater damages than another is not dispositive provided those awards are not in conflict. *See Allen v. Dairy Farmers of Am., Inc.*, 2012 WL 5844871, at *7 (D. Vt. Nov. 19, 2012) (finding that, although dairy farmers asserted individualized harms as a result of defendants' alleged monopoly, adequacy was established).

A conflict must be "fundamental" to violate Rule 23(a)(4). *See id.*; *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (quoting 7A Charles Alan Wright

& Arthur R. Miller, Federal Practice & Procedure § 1768 (2d ed. 1986) ("It is axiomatic
that a putative representative cannot adequately protect the class if his [or her] interests
are antagonistic to or in conflict with the objectives of those he [or she] purports to
represent.")). In instances where a fundamental conflict does exist, the court may cure the
conflict by dividing the class into separate "homogeneous subclasses . . . with separate
representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*,
527 U.S. 815, 856 (1999); *see also In re Literary Works in Elec. Databases Copyright
Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011) (same); *Allen v. Dairy Farmers of Am., Inc.*,
279 F.R.D. 257, 274 (D. Vt. 2011) (finding a fundamental conflict where "the interests of
the class clearly diverge, and the proposed class representatives cannot adequately
represent all members of the class[]"). Defendants fail to identify a conflict of this
magnitude.

Plaintiffs are represented by three nonprofit civil rights organizations that
frequently litigate civil rights cases and a law firm with extensive litigation experience.
Defendants do not question the experience and adequacy of Plaintiffs' legal counsel,
which are "qualified, experienced[,] and able to conduct the litigation." *Baffa v.
Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The proposed class representatives are similarly situated, if not identical, to the
class members they seek to represent, have no antagonistic interests, and thus will "fairly
and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Because the
proposed class representatives' and class members' interests align, and because the
proposed class representatives do not have "any conflict of interest that would prevent
them from serving as a class representative[,]" (Doc. 211 at 41), Plaintiffs have
established adequacy.

### 5.    Whether the Remaining Proposed Classes are Ascertainable.

Plaintiffs assert that, because their purported class definitions "identify specific
groups of people, subjected to specific acts, within a defined time period[,]" *id.* at 42, the
proposed class definitions are based on objective criteria and are therefore ascertainable.
The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23

of the Federal Rules of Civil Procedure." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks omitted).

A proposed class "must be 'sufficiently definite' and 'defined by objective criteria' *so that* 'it is administratively feasible for the court to determine whether a particular individual is a member[.]'" *In re Petrobras Sec.*, 862 F.3d 250, 269 n.20 (2d Cir. 2017) (emphasis in original) (quoting *Brecher*, 806 F.3d at 24-25). The Second Circuit has, however, rejected "administrative feasibility as an absolute standard[,]" *id.* 267, and "only preclude[s] certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. "[T]he use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class." *Id.* at 266 (footnote and internal quotation marks omitted).

Defendants contend the Checkpoint and Tinted Windows Classes are not ascertainable because only members issued invalid tickets are appropriate class members and because Plaintiffs allegedly arbitrarily selected the Classes' determining characteristics. Defendants, however, cannot redefine Plaintiffs' proposed classes.

Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.) This class therefore only includes individuals who were ticketed or arrested when passing through a Checkpoint. By narrowing the Checkpoint Class in this manner, Plaintiffs have identified a specific group of drivers determinable by BPD records and other public records who belong to the purported class.

The Tinted Windows Class includes "[a]ll Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.* Although the proposed definition for the Tinted Windows Class is considerably broader and encompasses a ten-year time period, because the class is limited to Black and Latino drivers who received a ticket for tinted windows, the class remains ascertainable. Plaintiffs have obtained electronic records detailing data of traffic citations and arrests by BPD that "includes the name and driver license number of the person

23

stopped, the location of the stop or arrest, the specific violation(s) alleged, and the identity of the issuing or arresting officer[.]" *Id.* at 54-55.

The Checkpoint and Tinted Windows Classes may be defined with "objective criteria that are administratively feasible[.]" *Petrobras*, 862 F.3d at 266 (internal quotation marks omitted). Plaintiffs have established ascertainability. *See Godson v. Eltman, Eltman & Cooper, P.C.*, 328 F.R.D. 35, 47 (W.D.N.Y. 2018) (finding that "[s]ince [p]laintiff may easily identify the members of the Settlement Class by reviewing [d]efendants' own records pertaining to the timeframe circumscribed by the class definition, the implied requirement of ascertainability is satisfied[]") (citing *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 176 (S.D.N.Y. 2014)).

### D.   Whether the Remaining Proposed Classes Meet the Rule 23(b)(3) Requirements.

In addition to Rule 23(a)'s requirements, where damages are sought, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are referred to as "predominance" and "superiority."

### 1.   Whether the Remaining Proposed Classes Meet the Predominance Requirement.

Plaintiffs contend that they will "establish that [a] City policy, custom, or deliberate indifference caused their injuries[,]"and because they challenge BPD policies and practices, "the evidence in support . . . [will allegedly] not vary from class member to class member" for either the Checkpoint Class or the Tinted Windows Class. (Doc. 211 at 44.) Rule 23(b)(3)'s predominance requirement "is satisfied if: (1) resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,' and (2) 'these [common] issues are more substantial than the issues subject only to individualized proof.'" *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).

> An individual [legal or factual] question is one where members of a proposed class will need to present evidence that varies from member to

member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.

*Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"Even if Rule 23(a)'s commonality requirement" is met, "the predominance criterion is far more demanding[,]" *Amchem Prods.*, 521 U.S. at 623-24, "and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Petrobras*, 862 F.3d at 270 (citing *Amchem Prods.*, 521 U.S. at 623-24). "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (alterations adopted) (emphasis in original) (citation and internal quotation marks omitted).

Defendants assert that predominance may not be found because each traffic stop requires an individualized determination as to its lawfulness. Plaintiffs counter that no individualized determinations are necessary because all Checkpoint stops were unconstitutional and all Tinted Windows class members' stops were lawful but resulted in racially motivated ticketing. Neither Class thus requires an individualized determination of liability. Defendants respond that questions of individualized damages nonetheless predominate. To the extent Plaintiffs seek general, nominal, and punitive damages, Defendants' concern is unfounded. *See Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (finding inquiries related to individualized damages tied to "the return of money extracted from [plaintiffs] as a result of . . . fraudulent judgments" were "not sufficient grounds on which to conclude that the district court's determination that individualized damages issues will not predominate in this case was an abuse of discretion[]"). "[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation." *Cnty. of L.A., Cal. v. Mendez*, 581 U.S. 420, 430-31 (2017). The Second Circuit has recognized that "loss of liberty is a distinct form of damage for which 'general damages' may be recovered." *Betances v. Fischer*, 2022 WL 765963, at \*10 (S.D.N.Y. Mar. 14, 2022)

(citing *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004)). Punitive damages may also be awarded on a class-wide basis. *See Brown*, 609 F.3d at 479 (noting the defendants in a putative class action "[we]re subject to claims for damages, including in some cases punitive damages[]").

To the extent Plaintiffs seek individualized economic damages for fines and fees, Defendants' argument gains some traction. Although it may be possible, and Plaintiffs suggest it will be probable, to establish a formula for damages, they have not yet proposed one. It would neither be efficient nor effective to certify a class to address common constitutional claims and then engage in a member-by-member determination of the recoverable damages for fees and fines. *Townes* instructs that the court cannot merely treat those economic injuries as fruit of the poisonous tree and instruct a jury to award damages on that basis.

Because Plaintiffs' requests for individual economic damages for fines and fees will require a determination of whether those economic consequences are justified in each class member's case, common questions of law and fact will not predominate for the damages portion of this case. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (finding district court improperly certified class where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class[]"). A court may, however, address this issue by decertifying the class to pursue such damages. *See Betances*, 2022 WL 765963, at *16 ("The class can be decertified after [trial] for purposes of pursuing individualized damages issues."). In the alternative, Plaintiffs may amend their request for individualized relief and propose a formula for general damages. In light of these options, denial of class certification on predominance grounds is not warranted at this time.

For the reasons stated above, although a close question, Plaintiffs have established predominance for the Checkpoint Class and the Tinted Windows Class.

### 2.    Whether the Remaining Proposed Classes Meet the Superiority Requirement.

Class actions are deemed superior when "they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (citing *Amchem Prods.*, 521 U.S. at 617).

> Rule 23(b)(3) identifies four factors for a court to weigh when determining whether a proposed class action satisfies . . . superiority[:] . . . (A) the class members' interests in individually controlling the actions; (B) the extent and nature of any ongoing, related litigation; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Wentworth v. Metrodata Servs., Inc.*, 2020 WL 13527954, at *8 (W.D.N.Y. Nov. 9, 2020) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 23(b)(3)) (citing *Sykes* 780 F.3d at 82).

"Manageability is the most important consideration," *id.* (citing *Sykes*, 780 F.3d at 82), and courts must be mindful of "the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually." *Id.* (internal quotation marks omitted). The need for judicial economy and the financial resources of the potential class members buttress this conclusion. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").

At this juncture, there is no apparent interest by putative class members to individually litigate their cases, nor would it be economically feasible to do so. There is also apparently no ongoing related litigation. It is both necessary and appropriate to locate the class action in this forum where the constitutional violations allegedly took place so that witnesses and parties may readily attend the trial. According to Plaintiffs, the facts and circumstances foreclose separate lawsuits because many of the proposed

class members "have limited income and lack access to counsel for individual litigation."
(Doc. 211 at 54.)

Based on the foregoing, the court finds class certification a superior means of adjudicating this case for the Checkpoint and Tinted Windows Classes.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to certify class is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated this ___22nd___ day of April, 2025.

Christina Reiss, District Judge
United States District Court